FILED

MAR 10 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY |
|---|

Name: ADAMS          ALAN          E.

LAST          FIRST          MIDDLE INITIAL

Prisoner Number: H-86005

Institutional Address: Pleasant Valley State Prison, P.O. Box 8500
Coalinga, CA. 93210

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KAW

ALAN EDWARD ADAMS

Petitioner,

vs.

SCOTT FRAUENHEIM, WARDEN

Respondent(s).

CV 17 1289

Case Number: _____
(Provided by the clerk upon filing)

PETITION FOR A WRIT
OF HABEAS CORPUS

(PR)

I.   INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

A.   What sentence are you challenging in this petition?

  1.  Name and location of court that imposed sentence (for example: Alameda County
      Superior Court, Oakland):

  2.  Court    Sonoma County Superior Court

  3.  Location    600 Administrative Drive, Santa Rosa, CA 95403

  4.  Case number, if known    MCR-167714

  5.  Date and terms of sentence    June 1993, Life Without Parole

  6.  Are you now in custody serving this term? ("In custody" means in jail, on parole or
      probation, etc.) ................................................................................ ⓎYES    NO

If yes, provide name and address of institution:

Pleasant Valley State Prison, P.O. Box 8500

Coalinga, CA. 93210

B. For what crime were you given this sentence?

*Note:* If your petition challenges a sentence for more than one crime, list each crime separately using California Penal Code numbers, if known. If you are challenging more than one sentence, you should file a different petition for each sentence.

Penal Code §§ 187, 190.2(c)(17), 459, 211, 12303.3,

& 246

C. Did you have any of the following proceedings?

Arraignment: ............................................................................ (YES)   NO

Preliminary Hearing:................................................................. (YES)   NO

Motion to Suppress: ................................................................. YES   (NO)

D. How did you plead? ................................. (Guilty)   Not Guilty   Nolo Contendere

Any other plea (specify) _____

E. If you went to trial, what kind of trial did you have?

Jury     Judge alone     Judge alone on a transcript

F. Did you testify at your trial? ........................................................ YES   NO

G. Did you have an attorney at the following proceedings:

1. Arraignment ...................................................................... (YES)   NO

2. Preliminary hearing........................................................... (YES)   NO

3. Time of plea ...................................................................... (YES)   NO

4. Trial.................................................................................... (YES)   NO

5. Sentencing......................................................................... (YES)   NO

6. Appeal ............................................................................... YES   (NO)

7. Other post-conviction proceeding.................................... YES   (NO)

H. Did you appeal your conviction? ................................................. YES   (NO)

1. If you appealed, to what court(s) did you appeal?

1  Court of Appeal................................................... YES    Year:_____  (NO)

2  Result: _____

3  Supreme Court of California........................... YES    Year:_____  (NO)

4  Result: _____

5  Any other court .................................................. YES    Year:_____  (NO)

6  Result: _____

7  2.  If you appealed, were the grounds the same as those that you are raising in this

8     petition?............................................................................................. YES    NO

9  3.  Did the court issue an opinion?........................................................ YES    NO

10 4.  Did you seek permission to file a late appeal under Rule 31(a)?........ YES    NO

11     If you did, give the name of the court and the result: _____

12     _____

13 I.  Other than appeals, have you previously filed any petitions, applications or motions with

14     respect to this conviction in any court, state or federal?....................... (YES)    NO

15 *Note:* If you previously filed a petition for a writ of habeas corpus in federal court challenging the
16 same conviction you are challenging now and if that petition was denied or dismissed with
17 prejudice, you must first file a motion in the U.S. Court of Appeals for the Ninth Circuit
       for an order authorizing this court to consider this petition. You may not file a second or
       successive federal habeas petition without first obtaining such an order from the Ninth Circuit.
18 28 U.S.C. § 2244(b).

19 If you sought relief in any proceeding other than an appeal, answer the following

20 questions for each proceeding.  Attach extra paper if you need more space.

21 1.  Name of court:  Sonoma County Superior Court

22     Type of proceeding:  Habeas Petition

23     Grounds raised (be brief but specific):

24     a.  The same two Constitutional Claims raised herein.

25     b. _____

26     c. _____

27     d. _____

28     Result: See, Exh. M, at p. 134 of Exh. Volume  Date of result: 4/14/16

2. Name of court: California Court of Appeal, 1st App. Dist.

Type of proceeding: Habeas Petition

Grounds raised (be brief but specific):
   The same two Constitutional Claims raised herein.

a. _____

b. _____

c. _____

d. _____
Result: See, Exh. N, at p. 138 of Exh. Volume   Date of result: 5/26/16

3. Name of court: California Supreme Court

Type of proceeding: Habeas Petition

Grounds raised (be brief but specific):
   ? The SAme two Constitutional Claims raised herein.

a. _____

b. _____

c. _____

d. _____
Result: See, Exh. R, at p. 161 of Exh. Volume   Date of result: 8/17/16

4. Name of court: _____

Type of proceeding: _____

Grounds raised (be brief but specific):

a. _____

b. _____

c. _____

d. _____ Date of result: ____
Result: _____

J. Is any petition, appeal or other post-conviction proceeding now pending in any court?
................................................................................ YES   NO

Name and location of court: _____

_____

II.   **GROUNDS FOR RELIEF**

State briefly every reason why you believe you are being confined unlawfully. Give facts to support each claim. For example, what right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

*Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 USC § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L.Ed.2d 517(1991).*

Claim One: Right to 14th Amendment equal protection are being violated by the exclusion of Life Without Parole prisoners from those qualifying for relief under Senate Bills 9, 260, & 261

Supporting facts: See Memorandum of Points and Authorities, Post, at pp. 11-21.

Claim Two: Rights under the 8th Amendment are being violated by the failure to allow a "meaningful opportunity" to be paroled.

Supporting facts: See Memoradum of POints and Authorities, post, at p.19

Claim Three: _____

Supporting facts: _____

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why: _____

PETITION FOR A WRIT OF HABEAS CORPUS (rev. 8/2015)
page 5 of 6

1

2

3  List, by name and citation only, any cases that you think are close factually to yours so that they

4  are an example of the error you believe occurred in your case. Do not discuss the holding or

Miller v. Alabama (2012) 183 L.Ed.2d 407.

5  reasoning of these cases:_____

Graham v. Florida (2010) 560 U.S. 130

6  _____

Roper v. Simmons (2005) 543 U.S. 551

7

8  _____

Do you have an attorney for this petition?............................................................ YES    NO

9

10  If you do, give the name and address of your attorney: _____

11  _____

12

13  WHEREFORE, petitioner prays that the court grant him/her the relief to which he/she may be

14  entitled in this action. I verify under penalty of perjury that the foregoing is true and correct.

15  Executed on:

16      3/5/17                            _____

                Date                          Signature of Petitioner

17

18

19

20

21

22

23

24

25

26

27

28

1 | Alan Edward Adams, H-86005

2 | Pleasant Valley State Prison; B5-224U
   | P.O. Box 8500
3 | Coalinga, CA. 93210

4

5

6

7 | UNITED STATES DISTRICT COURT

8 | NORTHERN DISTRICT OF CALIFORNIA

9

10 | ALAN EDWARD ADAMS,                    ) CASE #: _____
                                          )
11 |                   Petitioner         ) SCSC# MCR-167714
                                          ) 1 CRIM3 #: A148350
12 | VS.                                   ) CSC #: S235487
                                          )
13 | SCOTT FRAUENHEIM,                     )
                                          )
14 |                   Warden/Respondent  )

15

16

17

18 | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
   | PETITION FOR WRIT OF HABEAS CORPUS
19 | (EXHIBITS FILED SEPARATELY)

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.   STATEMENT OF THE CASE ... 8

II.  STATEEMENT OF FACTS ... 8

III. THIS PETITION IS TIMELY IN TERMS OF 28 U.S.C. §2244(D) ... 8

IV.  THIS PETITION PRESENTS SUBSTANTIAL CONSTITUTIONAL ISSUES OF BEARING ON THE PROPRIETY OF HUNDREDS OF LIFE-WITHOUT SENTENCES ... 9

V.   PETITIONER'S RIGHT TO EQUAL PROTECTION OF THE LAW UNDER THE 14TH AMENDMENT AND LIKE PROVISIONS OF THE CALIFORNIA CONSTITUTION ARE BEING VIOLATED BY THE EXCLUSION OF LIFE WITHOUT PAROLE PRISONERS FROM THOSE QUALIFYING FOR RELIEF UNDER SENATE BILLS 9, 260, AND 261 ... 12

   A. THE LAW OF EQUAL PROTECTION ... 12

   B. THE PASSAGE OF SB 261 ESTABLISHES THAT THE STATE HAS NO COMPELLING INTEREST IN EXCLUDING 18-YEAR-OLDS FROM THE BENEFITS OF SB 9, 260 AND 261 – AND THAT THE EXCLUSION OF 18-YEAR-OLD LWOPPS FROM THE BENEFITS OF THOSE THREE SENATE BILLS IS NOT NECESSARY TO FURTHER THEIR PURPOSE ... 13

      1. THE U.S. SUPREME COURT LAID THE FOUNDATION FOR SB 9, 260, AND 261 ... 13

      2. THE CALIFORNIA LEGISLATURE'S ADOPTION OF THE RATIONALE OF ROPER, GRAHAM, AND MILLER, AND ITS EFFORT TO IMPLEMENT IT THROUGH SB 9 AND 260 ... 15, 18

   C. ARGUMENT

VI.  PETITIONER'S RIGHTS UNDER THE 8th AMENDMENT AND CALIFORNIA CONSTITUTION, ARTICLE I, § 17, ARE BEING VIOLATED BY THE FAILURE TO ALLOW HIM A "MEANINGFUL OPPORTUNITY" TO PAROLE ... 20

VII. RESPONSE TO THE 4/14/16 RULING OF SONOMA COUNTY SUPERIOR COURT ... 20

VIII. CONCLUSION ... 20

PRAYER AND VERIFICATION ... 22

**TABLE OF AUTHORITIES**

**CASES:**

Cunningham v. California (2007) 549 U.S. 270 ............................................. 9

Dep't of Corr. & Rehab. V. State Personnel Board (2013) 215 Cal.App.4th 1101 ............................................. 15

Ex Parte Dixon (1953) 41 Cal.3d 756 ............................................. 10

Graham v. Florida (2010) 560 U.S. 130 ............................................. 14, 17

Honchariw v. County of Stanislaus (2013) 218 Cal.App.4th 1019 ............................................. 15

In re Antazo (1970) 3 Cal.3d 100 ............................................. 11

In re Barefoot (1998) 61 Cal.App.4th 923 ............................................. 9

In re Bartlett (1971) 15 Cal.App.3d 176 ............................................. 9

In re Clark (1993) 5 Cal.4th 750 ............................................. 10

In re Crockett (2008) 159 Cal.App.4th 751 ............................................. 9

In re Harris (1993) 5 Cal.4th 813 ............................................. 10

In re Hochberg (1970) 2 Cal.3d 870 ............................................. 11, 22

In re Jiminez (1985) 166 Cal.App.3d 686 ............................................. 13

In re Reno (2012) 5 Cal.4th 428 ............................................. 9, 10

In re Robbins (1998) 18 Cal.4th 770 ............................................. 9

In re Watson (2010) 181 Cal.App.4th 956 ............................................. 9

In re Wilson (2015) 233 Cal.App.4th 544 ............................................. 9

Miller v. Alabama (2012) 183 L.Ed.2d 407 ............................................. 9, 13 -14, 17, 18-19

People v. Caballero (2012) 55 Cal.4th 262 ............................................. 17, 21-22

People v. Duvall (1995) 9 Cal.4th 464 ............................................. 10, 11, 22

People v. Johnson (2015) 234 Cal.App.4th 1783 ............................................. 15

People v. Murray (1994) 23 Cal.App.4th 1432 ............................................. 13

People v. Nguyen (1997) 54 Cal.App.4th 705 ............................................. 13

People v. Olivas (1976) 17 Cal.3d 236 ............................................. 12

People v. Poole (1985) 168 Cal.App.3d 316 ............................................. 13

1 | People v. Robinson (2011) 200 Cal.app.4[th] 552 — 15

2 | People v. Sage (1980) 26 Cal.3d 498 — 12

3 | People v. Tiney (2014) 225 Cal.app.4[th] 1150 — 15

4 | Raef v. App. Div. of Superior Court (2015) 240 Cal.App.4[th] 1112 — 15

5 | Roper v. Simmons (2015) 543 U.S. 551 — 13, 14

6 | Wesbrook v. Mihaly (1970) 2 Cal.3d 765 — 13

7 | **OTHER AUTHORITIES:**

8 | California Constitution, Article I, section:

9 |     7(a) — 3, 12
    17 — 20
10 |     24 — 3, 12

11 | California Penal Code, section:

12 |     187 — 2
    190.2(c)(17) — 2
13 |     211 — 2
    246 — 2
14 |     459 — 2
    1170(a)(1) — 15
15 |     1170(d)(2) — 15
    12303 — 2

16 |

17 | United States Constitution, Amendment:

    Eight — 18-19
18 |     Fourteen — 3, 11, 18

19 | Atlas Shrugged, Ayn Rand — 20

20 | The Autobiography of a Yogi, Paramahansa Yogananda — 21

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

## TABLE OF EXHIBITS

EXHIBIT A:   The text of Senate Bill 9 — 2

EXHIBIT B:   The text of Senate Bill 261 — 13

EXHIBIT C:   The criminal complaint in Petitioner's case — 17

EXHIBIT D:   The abstract of judgment in Petitioner's case — 27

EXHIBIT E:   Declaration of Petitioner regarding his birth date — 31 ½

EXHIBIT F:   Senate third reading of SB 9 as amended on July 2, 2012 — 32

EXHIBIT G:   The text of Senate Bill 260 — 39

Senate Committee on Public Safety's report of April 4, 2013 on SB 260 — 44

Senate Rules Committee's report of September 3, 2013 on SB 260 — 55

Senate third reading of SB 260 — 67

Assembly Committee on Appropriations' report of August 12, 2013 on SB 260 — 72

Assembly Committee on Public Safety's report on SB 260 of June 27, 2013 — 76

EXHIBIT H:   The Senate Committee on Public Safety's report on SB 9 of April 5, 2011 — 86

EXHIBIT I:   Assembly Committee on Public Safety's report on SB 9 of My 27, 2011 — 99

EXHIBIT J:   Assembly Committee on Appropriations' report of July 8, 2015 on SB 261 — 114

EXHIBIT K:   Senate Rules Committee's report of June 1, 2015 on SB 261 — 118

EXHIBIT L:   Senate Committee on Public Safety's report of March 25, 2015 on SB 261 — 126

EXHIBIT M: 4/14/16 Order of Sonoma County Superior Court — 134

EXHIBIT N: The 5/26/16 Order of the Court of Appeal denying habeas petition — 138

EXHIBIT O: The 4/22/16 Informal Briefing Order from the Napa Superior Court in In re Duvall regarding the same constitutional claims presented herein — 140

EXHIBIT P: The Informal Response from the Napa District Attorney in In re Duvall Regarding the same constitutional claims presented herein — 142

EXHIBIT Q: The Reply to the Informal Response in the Napa Superior Court in In re Duvall regarding the same constitutional claims presented herein — 154

EXHIBIT R: The 8/17/16 Order of California Supreme Court — 161

I.

STATEMENT OF THE CASE

STATEMENT OF THE CASE

It is undisputed that Petitioner pled guilty to a long list of crimes including murder and conspiracy to commit murder. (See, Exh. D.) He was sentenced to life without possibility of parole (hereafter: 'LWOPP') on July 26, 1993. (Ibid.)

The crimes were alleged to have occurred between March 24, 1991 and June 4, 1991, with the most serious offenses occurring during the six-day period of May 29th to June 4th, 1991. (Exh. C.)

Petitioner was born on January 1, 1973. (Exh. E.) Thus, he was 18 years, five months, old at the time of the offenses for which he was sentenced.

No appeal was taken and Petitioner has never, prior to this action, filed any petition challenging his conviction or sentence.

The within claims were presented to the Sonoma County Superior Court by a habeas petition filed on March 10, 2016, and denied, virtually without explanation, on 4/14/16. (See, Exh. M [4/12/16 Order of Sonoma County Superior Court].)

Petitioner's response to that order appears, post, at p. 20.

The California Court of Appeal, First Appellate District, denied the claims without explanation on 5/26/16. (See, Exh. N.) The California Supreme Court denied the claims on 8/17/16. (See, Exh. R.)

II.

STATEMENT OF FACTS

The facts underlying the conviction have no bearing on the constitutional claims raised herein. Moreover, since Petitioner never appealed, there is no readily available summary thereof. Thus, they will not be recited here.

III.

THIS PETITION IS TIMELY IN TERMS OF 28 USC §2244(d)

Senate Bill 261 was signed by Governor Brown and filed with the Secretary

1    of the State of California on October 3, 2015, just five months before the
2    within claims were filed in the Superior Court.  (See, Exh. B [text of SB
3    261] & Exh. M.)  Petitioner's equal protection and cruel and unusual punishment
4    arguments are predicated on the enactment of SB 261.  Absent SB 261 those
5    arguments would simply not exist.  (See, post, pp. 12-17)

6         Thus, once due allowance is made for statutory tolling allowable under
7    28 USC § 2244(d), the within claims have been filed with this court within
8    a year of the event (i.e., enactment of SB 261 on January 1, 2017, upon which
9    the petition is predicated.)

                                    IV.
                                 OVERVIEW
10
                THIS PETITION PRESENTS SUBSTANTIAL CONSTITUTIONAL ISSUES OF
11                        STATE WIDE IMPORTANCE BEARING ON THE
                       PROPRIETY OF HUNDREDS OF LIFE WITHOUT SENTENCES
12

13

14        It is not uncommon for new laws to have implications on existing laws that the courts must resolve.  Senate
15   Bills 9, 260, & 261 present just such an issue for the courts.  The California legislature and Governor Brown
16   enacted SB 260 partly in recognition that many juveniles are serving sentences that are equivalent to, if not
17   technically, life without parole, and thus run afoul of Miller V. Alabama (2012) 183 L.Ed.2d 407.

18        The court in Miller accepted 18 as a constitutional dividing line between juvenile and adult.  That line is
19   not both cruel and unusual (yet).  However, Miller does not prohibit states from raising that line.

20        In accordance with evolving national and international norms, California has now enacted SB 261, which
21   recognizes the juvenile mindset that is present in 17 year olds, is also prevalent in 22 year olds.  The legislative
22   history of SB 261 shows the legislature used the same reasoning and psychological studies in support of both bills.
23   (See, post, at pp. 16-18.)

24

25

26

27

28

                              9, 10, +11

1    California has now placed itself in the position of saying that all people under the age of 23 possess a

2    juvenile mindset that affects "judgment and decision-making" which is "highly relevant to criminal behavior and

3    culpability" (see, post, p. 18), except those sentenced to LLWOP or death, who necessarily have a fully developed

4    brain with an adult mindset.  Yet the California legislature has now determined that young people between the

5    ages of 18 and 23 are similarly situated in mental development and criminal culpability to those under 18 years of

6    age.  (See, post, at pp. 13-18; Exhibits F, G, H, I, J, and K.)  This conflict must be resolved by the courts.

7

8

9

10

11

12                                                    V.
                    PETITIONER'S RIGHT TO EQUAL PROTECTION OF THE LAW UNDER THE
13              14TH AMENDMENT AND LIKE PROVISIONS OF THE CALIFORNIA CONSTITUTION
                 ARE BEING VIOLATED BY THE EXCLUSION OF LIFE WITHOUT PAROLE PRISONERS
14              FROM THOSE QUALIFYING FOR RELIEF UNDER SENATE BILLS 9, 260, AND 261

15                                                    A.
                                    THE LAW OF EQUAL PROTECTION
16

17        The principle of equal protection of the law is enshrined in the U.S. Constitution, Amendment 14, and

18    California Constitution, Article I, sections 7(a) and 24.

19        The California Supreme Court in In re Antazo (1970) 3 Cal.3d 100, 109-112 reviewed the law of equal

20    protection:

21        "Simply stated that the 'concept of equal protection of the laws compels recognition of the proposition that
          persons similarly situated with respect to the legitimate purpose of the law receive like treatment."
22        [Citations.]

23        "The traditional test has been that the 'distinction drawn by a challenged statute must bear some rational
          relationship to a legitimate state end and will be set aside if based on reasons totally unrelated to the pursuit
24        of that goal.  [Cite.]  But a stricter standard has been prescribed in cases involving 'suspect classifications'
          or 'fundamental interests.'  [Citations.] ...
25
          "[I]n cases involving 'suspect classifications' or touching on 'fundamental interests,' [ ] the court has
26        adopted an attitude of active and critical analysis, subjecting the law to strict scrutiny.  [Citation.]  Under
          the strict standard applied in such cases, the state bears the burden of establishing not only that it has a
27        compelling interest which justifies the law but that the distinctions drawn by the law are necessary to
          further its purpose.  [Citations.]" (Emphasis in the original.)
28

                                                    12

1   Liberty is a "fundamental interest." (See, People v. Olivas (1976) 17 Cal.3d 236, 251.) Strict scrutiny is

2   applied to sentencing statutes that can have the effect of prolonging incarceration. (See, People v. Sage (1980) 26

3   Cal.3d 498, 508 [felons must also receive conduct credits under Penal Code § 4019 that are granted to

4   misdemeanants]; People v. Nguyen (1997) 54 Cal.App.4th 705, 714-9 [applying strict scrutiny to 3-strikes statutory

5   scheme]; In re Jiminez (1985) 166 Cal.App.3d 686, 691-4 [equal protection requires conduct credits for

6   misdemenants housed at CRC along the same lines as granted felons]; People v. Olivas (1976) 17 Cal.3d 236, 247-

7   254 [overturning statutory scheme that inflicted greater punishment upon juveniles than similarly situated adults];

8   People v. Murray (1994) 23 Cal.App.4th 1783, 1791-3 [double-the-base-term limitation of Penal Code § 1170.1

9   must be applied to mixed felony and misdemeanor sentences on equal protection grounds]; People v. Poole (1985)

10  168 Cal.App.3d 316, 325-7 [work-time credits for presentence custody mandated on equal protection grounds].)

11      The right to be free from cruel and unusual punishment under the Eighth Amendment and California

12  Constitution, Article I, section 17 is also a "fundamental interest." (See, post, pp. 17-18 [establishing the Eighth

13  Amendment violation].)

14      Thus, to paraphrase the California Supreme Court, "the State bears the burden of establishing not only that

15  it has a **compelling** interest which justifies [the exclusion of Petitioner from Senate Bills 9, 260, and 261] but that

16  the distinctions drawn by these statutes are **necessary** to further [their] purpose." (Westbrook v. Mihaly (1970) 2

17  Cal.3d 765, 785.)

18
**B.**
**THE PASSAGE OF SB 261 ESTABLISHES THAT THE STATE HAS NO COMPELLING**
19  **INTEREST IN EXCLUDING 18-YEAR-OLDS FROM THE BENEFITS OF SB 9, 260, AND**
**261 – AND THAT THE EXCLUSION OF 18-YEAR-OLD LWOPP'S FROM THE BENEFITS**
20  **OF THOSE THREE SENATE BILLS IN NOT NECESSARY TO FURTHER THEIR PURPOSE**

21
**1.**
**THE U.S. SUPREME COURT LAID THE**
22  **FOUNDATION FOR SB 9, 260, AND 261**

23      The reformation of California's sentencing scheme for serious juvenile and young-adult offenders was

24  heralded by three landmark decision: Roper v. Simmons, Graham v. Florida, and Miller v. Alabama.

25      Roper v. Simmons (2005) 543 U.S. 551 held that the imposition of capital punishment on a juvenile

26  offender violated the Eighth Amendment. The court relied on studies showing that "developments in psychology

27  and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts

28  of the brain involved in behavior control continue to mature through late adolescence. Juveniles are [also] more

1  capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved

2  character' than are the actions of adults." (Roper, 543 U.S. at 570)

3      Five years later, the High Court handed down Graham v. Florida (2010) 560 U.S. 130.  Graham prohibited

4  the imposition of a life-without-parole sentence on juvenile offenders who committed nonhomicide crimes.  It held

5  that such prisoners must be granted some realistic opportunity to obtain release.  The Graham court reasoned that it

6  could not be conclusively determined at the time of sentencing that a juvenile would be a danger to society for the

7  rest of his life and so a LWOPP sentence improperly denied the juvenile offender a chance to demonstrate growth,

8  maturity and rehabilitation.

9      Miller v. Alabama (2012) 183 L.Ed.2d 407 held that mandatory LWOPP sentences for juvenile murderers

10  precluded consideration of their chronological age and its hallmark characteristics – among them, immaturity,

11  impetuosity, and failure to appreciate risks and consequences, thus violating the 8th Amendment.

12      The empirical lynchpin of Roper, Graham, and Miller was a then emerging, and now settled, scientific

13  consensus as to the very real physical, behavioral, psychological, and neurological differences between children

14  and adults, and as establishing that the transition between childhood and adulthood does not, as had long been

15  believed, occur at the age of 18, but rather in the early to mid 20's.

16      For example, Miller points to how "developments in psychology and brain science continue to show

17  fundamental differences between juvenile and adult minds."  (Graham, supra, 176 L.Ed.2d at 842-4; Roper, 543

18  U.S. at 569-70.)  The Miller Court cited, "an ever growing body of research in developmental psychology and

19  neuroscience" which supported the ratio decidendi in that case.  (See, Miller at n.5.)  It reasoned that there was an

20  "enhanced prospect" that a young offender's actions reflect a transient state of "deficien[t]" consciousness "that, as

21  the years go by and [further] neurological development occurs" "will be reformed." (Miller, 183 L.Ed.2d at 419.)

22      "Roper and Graham emphasized that the distinctive attributes of youth diminish the penological
       justification for imposing the harshest sentences on juvenile offenders, even when they commit terrible
23     crimes.  Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for
       retribution is not as strong with a minor as with an adult."
24
       "Nor can deterrence do the work in this context, because the same characteristics that render juveniles less
25     culpable than adults – their immaturity, recklessness, and impetuosity – make them less likely to consider
       potential punishment.  [ ]  Similarly, incapacitation could not support the life-without-parole sentence in
26     Graham:   Deciding a juvenile offender forever will be a danger to society would require making a
       judgment that he is incorrigible but incorrigibility is inconsistent with youth.  And for that reason
27     rehabilitation could not justify that sentence.  Life without parole forswears the rehabilitative ideal.
       [Citation.]  It reflects an irrevocable judgment about an offender's value and place in society, at odds with a
28     child's capacity for change." Miller, supra, 183 L.Ed.2d at 419-20.

14

**2.**
**THE CALIFORNIA LEGISLATURE'S ADOPTION OF THE RATIONALE OF ROPER, GRAHAM, AND MILLER, AND ITS EFFORT TO IMPLEMENT IT THROUGH SB 9 AND 260**

Senate Bill 9 took effect on September 30, 2012. (Exh. A.) It recites that "the purpose of imprisonment for crime is punishment" but also observed that this "purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentence of offenders committing the same offense under similar circumstances." (Penal Code § 1170(a)(1) [emphasis added].) Inasmuch as it retroactively allows LWOPP defendants who were sentenced for crimes committed prior to their 18th birthday to have their sentence reduced to allow for the possibility of parole after they have served 15 years (Id at § 1170(d)(2)(A)(i), it amounts to a legislative finding that said parole eligibility for LWOPP's is not inconsistent with the Legislature's views on deterrence, punishment, proportionality, and culpability.

The Senate's Third Reading on the Bill is illuminating:

"According to the Author, 'Under existing California law, youth under the age of 18 years old are sentenced to life in prison without the possibility of parole. There is no system of review for these cases. The use of this sentence for juveniles 1) ignores neuroscience and well-accepted understandings of adolescent development; 2) is a practice that is in violation of international law and out of step with international norms; and 3) in California, it is a policy that is applied unjustly. Youth are different from adults. While they should be held accountable for their actions, even those who commit serious crimes should have the opportunity to prove they have matured and changed.'" (See, Exh. F. at p. 37.)

The Author's comments to SB 9 are relevant to the interpretation of Senate Bill 9 because the California judiciary has often turned to that commentary as published by the Legislature in connection with its deliberations to interpret and discern legislative intent. (CF., Raef v. Appellate Division of Superior Court (2015) 240 Cal.App.4th 1112, 1131-2 [Using 'Author's Statement' to discern legislative intent]; People v. Johnson (2015) 234 Cal.App.4th 1432, 1443-4 [using Author's statement and the Senate Committee on Public Safety Analysis of the Bill]; People v. Tiney (2014) 225 Cal.App.4th 1150, 1158-9, 1165 [using author's statement to analyze legislative intent]; Honchariw v. County of Stanislaus (2013) 218 Cal.App.4th 1019, 1029-30 ["The Author's statement about the intent of Assembly Bill 369 ... creates a strong., but nonconclusive inference...."]; Department of Corrections and Rehabilitation v. State Personnel Board (2013) 215 Cal.App.4th 1101, 1111 ["To the contrary, the Author's Statement ... persuades us all the more that the Legislature meant exactly what it said...."]"; People v. Robinson (2011) 200 Cal.App.4th 552 n. 23 [Author's statement shows that Assembly Bill 4 "indisputably was motivated...."]

The Senate Committee on Public Safety's internal report on Senate Bill 9 contains a more extensive

1    description of the Author's and the Legislature's intent:

2      "4. <u>Adolescent Development and Legal Culpability</u>

3      "The creation of the modern juvenile court, now over 100 years ago, was rooted in the idea that adolescents, who are not fully developed or mature, are less culpable than adults. As explained below, this
4      viewpoint is not completely compatible with the 'adult time for adult crime' philosophy that emerged in the 1990's:

5

6          "The common law assumed that adolescents are less culpable than adults, and the juvenile court institutionalized this notion both jurisprudentially and statutorily. That is, the juvenile court offered a punishment discount for adolescents punished as juveniles, relative to the punishment given to
7          adults. This discount is rooted in the belief that serious crimes committed by young offenders may reflect developmental deficiencies in autonomy and social judgment, suggesting a reduction in their
8          culpability and, in turn, their punishment liability. ...

9          "Recent developments in transfer law often express the preference of penal proportionality over the common law assumptions of reduced culpability of adolescent offenders. In this view, the traditional
10          preoccupation with rehabilitation in the juvenile court, with its limitations on punishment opportunities, deprecates the moral seriousness of crimes and offers inadequate retribution.
11          Proponents of harsher punishments for adolescents argue that punishments that are disproportionately lenient compared to the severity of the adjudicated offense also undermine both
12          the specific and general deterrent effects of legal sanctions.

13          "These developments reflect the presumption in modern juvenile justice law that those who commit crimes and are remanded to the criminal court, or even those who are charged with such crimes are
14          **fully culpable for their acts. This legal threshold clashes with emerging empirical evidence on the immaturity of adolescents with respect to both their ability to make informed and nuanced**
15          **judgments about their behavior, as well as their moral development. By ignoring these indicia of reduced culpability, the new transfer or waiver policies offend the common law doctrine of**
16          **incapacity.**

17      "Researchers in the science of human development, however, generally agree that from a developmental standpoint, an adolescent is not an adult:

18

19          **"The evidence now is strong that the brain does not cease to mature until the early 20's in those** relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences,
20          and other characteristics that make people morally culpable. ... **Indeed, age 21 or 22 would be closer to the 'biological age of maturity.'**

21      "Some scholars argue that the unique nature of adolescent development affect considerations of both culpability and deterrence when measuring the value and suitability of imposing adult criminal sanctions on
22      juveniles:

23          "The culpability analysis of juvenile impulsiveness and risk-taking implicitly embraces the developmental notion that some forms of adolescent behavior are the result of a not yet fully formed
24          ability to control impulses. In effect, young people do not have the same capacity for self-control as adults and this should be considered a mitigating factor when assessing culpability. Similarly, the
25          proclivity of adolescents to take risks and act on a whim skews the traditional deterrence calculus for the adolescent actor. Adolescents are not likely to recognize all possible options and therefore, their
26          preference prioritization may be completely tilted towards outcomes that they expect will provide immediate gratification but that do not actually maximize their utility." (See, post, at Exh. H, p. 94-
27          96 [emphasis added].)

28      The commentary appended to The Assembly Committee on Public Safety's "Summary" of SB 9, contains

1  more on its underlying rationale:

2  "There is no evidence that the use of life without parole sentences deter crime.  The U.S. Supreme Court
   stated, 'As for deterrence, it is unclear whether the death penalty has a significant or even measurable
3  **deterrent effect on juveniles…**' If the death penalty has no deterrent value, it is difficult to imagine that a
   lesser penalty of life without parole would have more of a deterrent value.  With regard to juvenile life
4  without parole, the evidence indicates that life without parole sentences provide no deterrent effect.
   Additionally, it is now recognized that the adolescent brain is still developing an ability to comprehend
5  consequences and control impulses.  This makes it all the less likely that **the specter of a harsh sentence
   will affect juvenile's [sic] behavior.**" (Exh. I, post, at p. 107 [emphasis in original].)

6

7      A review of the legislative history of Senate Bill 260 demonstrates that many of the same policy

8  considerations led to its passage.  This is from the report of the Senate Committee on Public Safety on SB 260:

9      "The current system provides no viable mechanism for reviewing a case after a young person has served a
   substantial period of incarceration and can show maturity and improvement.

10

11     "Existing sentencing laws do not distinguish youth from adults, however, recently court decisions are
   moving in this direction.  The US Supreme Court recently held unconstitutional mandatory life without
   parole sentences for people under the age of 18, and required courts to consider the youthfulness of
12  defendants facing that sentence (Miller v. Alabama (2012)).  The California Supreme Court recently ruled
   in People v. Caballero (2012) that a sentence exceeding the life expectancy of a juvenile is the equivalent of
13  life without parole, and unconstitutional in nonhomicide cases….

14     "Recent scientific evidence on adolescent development and neuroscience show that certain areas of the
   brain, particularly those that affect judgment and decision-making, **do not fully develop until the early
15  20's.**  The US Supreme Court stated in 2005 Roper v. Simmons decision, [t]he reality that juveniles still
   struggle to define their identity means it is less supportable to conclude that even a heinous crime
16  committed by a juvenile is evidence of irretrievably depraved character.'  **Moreover, the fact that young
   adults are still developing means that are uniquely situated for personal growth and
17  rehabilitation.**" (See, Exh. G, post, at p. 49 [emphasis added].)

18     The Author of Senate bill 260 also quotes extensively from the holdings in Graham v. Florida, Miller v.

19  Alabama, and People v. Caballero.  (See, post, at pp. 50-52.)

20     Drawing on these sources and ideas, SB 260 conferred eligibility for parole on all non-LWOPP juvenile

21  offenders, regardless of their sentence, to commence no later than their 25th year of incarceration.  (Exh. G, at p.

22  42.)  Thus, a juvenile offender sentenced to 100-to-life for four homicides, would be eligible after 25 years.

23     Senate Bill 261 extended the parole eligibility benefits afforded by SB 260 to all those who committed

24  offenses under the age of 23.  The Assembly Committee of Appropriations explained the rationale behind SB 261

25  in this way:

26     "**COMMENTS: 1) Purpose.** According to the author, 'Much like the existing youth offender process, SB
   261 holds young people accountable and responsible for what they did.  They must serve a minimum of 15
27  of 25 years in prison depending on their offense, and must demonstrate remorse, maturity, and
   rehabilitation to be suitable for parole.'

28     "This reflects science, law, and common sense.  Recent neurological research shows that cognitive brain

17

development continues well beyond age 18 and into early adulthood. For boys and young men in particular, this process continues into the mid-20's. The parts of the brain that are still developing during this process affect judgment and decision-making and are highly relevant to criminal behavior and culpability. Recent US Supreme Court cases including Roper v. Simmons, Graham v. Florida, and Miller v. Alabama recognize the neurological difference between youth and adults. The fact that youth are still developing makes them especially capable of personal development and growth.

"The State of California recognizes this as well. State law provides youth with foster care services until age 21. It extends Division of Juvenile Justice jurisdiction until age 23. It also provides special opportunities for youth in our state prison system through age 25.

"To be clear: SB 261 is by no means a 'free ticket' for release. There is no mandate to a reduced sentence or release on parole, only the opportunity for a parole hearing after serving at least 15 to 25 years in state prison. Even after that period there is no guarantee for a grant of parole. The Board still has to examine each inmate's suitability for parole, the criteria for which this bill does not change. SB 261 will give young adults in prison hope and incentive to improve their lives." (See, Exh. J, post, at pp. 115-6 [emphasis added].)

Similar rationales are recorded in context of the reports of the Senate Rules Committee and the Senate Committee on Public Safety with respect to SB 261. (See, Exh's K & L. post, at pp. 118-133.)

Read together, the various committee reports on SB 261 are a legislative finding that males remain juveniles, and certainly cannot be considered adults for the purpose of punishment statutes, until they have crossed the threshold of their 23rd birthday.

**C.**
**ARGUMENT**

There is nothing in the legislative history of SB 261 that explains its exclusion of LWOPP prisoners. Indeed, every argument in favor of the legislation plainly applies with equal force to those who committed an offense with special circumstances prior to their 23rd birthday. As has already been demonstrated, the empirical foundation for SB 261 is a body of relatively recent scientific studies which persuaded the legislature that the notion that males are sufficiently mature to be treated as adults at 18 was a canard. Rather, the passage of SB 261 implicitly establishes that the legislature found no sufficient penological or moral justification to continue to exclude the 22-and-under offenders from the benefits conferred by SB 260 to 18-and-under offenders.

Moreover, as has been demonstrated above, Senate Bills 9, 260, and 261 all explicitly approve and incorporate the ratio decidendi of Miller v. Alabama, which held that the imposition of LWOPP sentences on murderers who have the mental state of juveniles violated the Eighth Amendment. (See, post, at pp. 19-22.)

Senate Bill 9 also expressly rests on a legislative finding that non-adults should be allowed a "meaningful opportunity" to parole if they become rehabilitated.

18

1    The California Legislature was not under any compulsion to pass 261, let alone to do so under the rationale

2  reflected in the legislative history. However, having framed the law as it did, the Supremacy Clause of the U.S.

3  Constitution, together with the 14th Amendment, require that it, like every law, be implemented in a fashion

4  consistent with equal protection.   If indeed, as our Legislature has now found, the mental, behavioral, and

5  psychological characteristics of those between 18 and 22, are not sufficiently different to legitimize punishing

6  them differently than offenders under the age of 18; if, in a word, those under 23 are all 'juveniles,' and should

7  therefore be treated the same – then Petitioner, who offended at the age of 18, was sentenced to LWOPP in

8  derogation of the Eighth Amendment and California Constitution, Article I, Section 17, for all the reasons stated in

9  Miller v. Alabama.

10    And that, in turn, means that those who, like Petitioner committed crimes before their 23rd birthday, should

11  be afforded all the benefits of Senate Bills 9, 260, and 261.

12    Put simply, while the California Legislature may have overlooked the implications of Senate Bills 9, 260,

13  and 261, the equal protection clauses of the State and Federal constitutions require that the benefits of that

14  legislation be extended to everyone that is similarly situated.   The recognition that males do not become adults

15  until they are at least 23 years old, read in context of Miller v. Alabama, establishes that for the purposes of Eighth

16  Amendment analysis, Petitioner is 'similarly situated' to the under-18 group that was the subject of the holding in

17  Miller v. Alabama.

18    The legislative history behind this trio of Senate bills also demonstrates that the California Legislature

19  maturely deliberated on all the traditional penological and moral justifications behind the sentencing schemes that

20  they overhauled and found they had been deligitimized by persuasive scientific evidence.  Neither the goals of

21  deterrence, retribution, rehabilitation, or proportionality – nor all of them together, supplied sufficient justification

22  to deny a non-adult offender a "meaningful opportunity" to eventually rejoin society.

23    Respondent, the State of California, through the California Department of Justice, or through the local

24  District Attorney, may very well respond to an OSC by invoking all the antiquated notions of penological science

25  that gave rise to the sentencing scheme that was in place at the time of Petitioner's conviction, but those arguments

26  will be unavailing, as the Legislature manifestly considered and rejected all of them.

27    The bare fact that LWOPP's were not expressly made eligible for the benefits of SB 261, will be the only

28  reed upon which the State may lean.   Yet, it will be insufficient support to withstand even the 'rational

19

1   relationship' test, let alone that of 'strict scrutiny.' Petitioner cited, ante, at pages 6 to 7, six cases in which the

2   California Judiciary recognized that sentencing legislation was flawed on Equal Protection grounds. For the

3   reasons given above, a similar holding would be condign with respect to Senate Bills 9, 260, and 261.

4

### VI.
### PETITIONER'S RIGHTS UNDER THE EIGHTH AMENDMENT AND CALIFORNIA
### CONSTITUTION, ARTICLE I, § 17, ARE BEING VIOLATED BY THE FAILURE
### TO ALLOW HIM A "MEANINGFUL OPPORTUNITY" TO BE PAROLED

5

6

7      Petitioner will not reiterate his argument here. He adopts in full the holding in Miller v. Alabama. Read

8   together with the legislative history, and rationale behind, Senate Bill 261, Petitioner contends that it establishes

9   that a mandatory LWOPP sentence constitutes cruel and unusual punishment in the context of Petitioner's case and

10   circumstance.

11

### VII.
### RESPONSE TO THE SONOMA COUNTY SUPERIOR COURT

12

13      Without reasoned elaboration, the Sonoma County Superior Court denied the petition. (See, Exh. M.)

14   With respect to petitioner's core contention (that SB 261 was a legislative finding that people retain the mentality

15   of "minors" until at least reaching their 23rd birthday – and that Miller found it violated the 8th Amendment to

16   impose an LWOPP sentence on one with that mentality), the Superior Court had nothing whatsoever to say.

17      Instead, the Superior Court just asserted, ipse dixit, that the principles of equal protection and the 8th

18   Amendment were not offended. More is required. The applicable standard of review, as established herein, is

19   "strict scrutiny." The lower court therefore had a duty to expound "a compelling [societal] interest which justifies

20   the law" and to demonstrate "that the distinctions drawn by the law are necessary to further its purpose." People v.

21   Olivas (1976) 17 Cal.3d 236, 251.

22      Petitioner has demonstrated how the legislative findings underlying SB 261 cause that law's exclusion of

23   LWOPP's to fail that standard of review. Nothing in the April 14th ruling of the Superior Court is to the contrary.

24

### VIII.
### CONCLUSION

25

26      Petitioner read Ayn Rand's Atlas Shrugged when he was 20. Whether because he was a product of a

27   secularized educational system, or because of some defect in understanding of what had previously been imparted

28   to him, it seemed to be the first reasoned exposition of a moral philosophy that he had ever been exposed to – and

1    he wept. The enormity of his wrongs hit him with avalanche-like force. Petitioner considered what he had done

2    and condemned himself utterly. Full of self-loathing, he decided he was not fit to live, postponing suicide only out

3    of concern as to how it would affect his mother. His plan became to wait until the shock of his arrest and

4    imprisonment receded, and his mother had adjusted to life without him, before he took his own life.

5        But God would not have it. Divine mercy and the light of a higher understanding reached him in 1998,

6    even in the depths of his depression and self-condemnation. Another prisoner shared with him the Autobiography

7    of a Yogi and the Bible. He has endeavored to live up to the moral code expressed in those books ever since.

8        He has never been involved in any violence in prison, nor cited for possession or use of any narcotics or

9    drugs. He currently works as the Lieutenant's Clerk at B-Facility, Pleasant Valley State Prison. He was sent to

10    this Level III yard, notwithstanding his LWOPP sentence, because he has been a 'programming' prisoner since his

11    commitment to the CDCR.

12        These personal details are mentioned here, thought NOT strictly relevant, because they underscore the wisdom

13    of the Legislature's finding that males under the age of 23 are anything but adults, and should therefore be

14    afforded an opportunity to reform themselves, and not be subject to unending punishment ceasing only at the point

15    of their last earthly breath.

16        Petitioner spent 19 years on a Level IV mainline without ever receiving a write-up for violence or

17    narcotics. The nearly 25 years he has lived since his commitment offenses, bears so little relation to the person

18    one might imagine him to be based upon the crimes he committed during his 18th year, as to render it absolutely

19    impossible to deduce the latter from the former. His subsequent behavior demonstrates a complete break with the

20    amorality which landed him in prison. In short, the evidence that he has reformed himself supports the inference

21    that crimes committed by 18-year-olds, even as the legislature posited in the course of passing SB 261, should not

22    be taken as a final reckoning of their nature. Those who have not matured, have a greater capacity to be reformed.

23    In its wisdom, and consistent with the benevolence of its citizens, the State of California, through its Legislature,

24    has so held. Petitioner does not here intend to confound that intent, but to request its application in full to those

25    that fall within its reasonably construed scope.

26        Petitioner's plight, and that of similarly situated prisoners, is perhaps best portrayed through a hypothetical.

27    Consider for a moment an individual who, at the age of 22, commits four homicides with a gun, for which he is

28    sentenced to 200-years-to-life (pursuant to Penal Code §§ 189, 12022.53(d)) – a LWOPP equivalent (see, People

1  v. Caballero 55 Cal.4th 262 [so holding]).  That 22-year-old is by law (SB 261) to be treated as a juvenile and

2  afforded an opportunity to parole after 25 years.  Whereas Petitioner, who was just 18 at the time of his crimes, is

3  never to be eligible, as the law stands, for parole even if he was to survive for 70 years in prison.  Yet, the

4  Legislature has recognized that both can only justly be classed as juveniles and the U.S. Supreme Court in Miller

5  v. Alabama held that there was no legitimate penological or social justification for denying juveniles a

6  "meaningful opportunity" to reform and, by virtue of that reformation, to be paroled.

7        Logically, given Miller and SB 261, the exclusion of LWOPP's from SB 261 can only be justified if it can

8  be said that those who commit special-circumstance offenses necessarily possess an adult mental state,

9  notwithstanding their chronological age.  However, this is an obvious fallacy, and thus, necessarily one wholly

10  without empirical support.  An 18 year-old's acts, no matter how heinous, do not make him an exception to the

11  proven neurological and behavioral imperatives to which humans are subject.  A juvenile's acts, no matter how

12  heinous, are not evidence of maturation; indeed, if anything, the opposite is true.

13        **Wherefore**, Peititioner prays for the issuance of an OSC.  (See, California Rules of Court, Rule 4.551(c).)

14  In that respect, he notes, that the question here is not whether the Court should order relief, but whether Petitioner

15  has pled sufficient facts "which, if true, would justify relief."  (People v. Duvall (1995) 9 Cal.4th 464, 475; In re

16  Hochberg (1970) 2 Cal.3d 870, 873-4 n.2.)

17  Respectfully Submitted,

18  Alan Edward Adams

19  Dated:  3/5/17

20                                    **VERIFICATION**

21

22        Petitioner declares under penalty of perjury that any facts asserted in the petition on personal knowledge

23  are true and correct to the best of his knowledge, information, and belief.  He also declares on the same basis that

24  the exhibits are true copies of the records that they are represented to be.  This verification is executed under

25  penalty of perjury under the laws of California at Coalinga, California.

26

27  Alan Edward Adams         Dated:  3/5/17

28